# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| TRS & Associates, Inc., | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:08-CV-03264-JOF |
| Document Imaging Technologies, Inc., | : | |
| Defendant. | : | |

## OPINION AND ORDER

This matter is before the court on Defendant's motion to dismiss for lack of personal jurisdiction and improper venue [3].

**I.   Background**

    **A.   Facts and Procedural History**

Plaintiff, TRS & Associates, Inc. ("TRS"), sued Defendant, Document Imaging Technologies, Inc. ("DIT"), for breach of contract and tortious interference with a business relationship. Plaintiff also seeks declaratory relief. Plaintiff is a resident of Georgia with its principal place of business in Atlanta, Georgia. Defendant is a California corporation with its principal place of business in California. TRS is in the business of providing "diversified

AO 72A
(Rev.8/82)

business process automation and information technology outsourcing solutions."[1] (Complaint, ¶ 5). TRS "automate[s] the process of dealing with active documents and data to reduce dependency on paper and the associated manual labor." *Id*. In order to carry out its business, TRS partners with other businesses such as electronic document service companies and consultants and electronic document equipment manufacturers.

Sometime before August 2006, FedEx-Kinko's, a nonparty to this litigation, entered into a contract with Amgen, another nonparty, under which FedEx-Kinko's would provide Amgen with document management and imaging services. To perform that contract, FedEx-Kinko's approached TRS sometime in the middle of 2006 concerning the possibility of TRS becoming a subcontractor on the Amgen project. TRS in turn contacted DIT to discuss partnering with DIT in the potential business relationship with FedEx-Kinko's. On August 12, 2006, in California, TRS and DIT signed a Mutual Nondisclosure/Non-Compete Agreement ("August Agreement"), prepared by Plaintiff. The August Agreement generally prohibited disclosure of confidential information and competition by the parties regarding the FedEx-Kinko's and Amgen project. The agreement also contained a Georgia choice of law provision stating, "This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Georgia, without giving effect to principles of

---

[1] The court takes the allegations from the complaint for the purposes of the motion to dismiss only.

2

conflicts of law." (August Agreement, ¶ 11). The August Agreement was to last the later of three years from the date of the Agreement or two years from the date on which confidential information was last disclosed. (August Agreement, ¶ 7). By November or December of 2006, it was determined that no arrangement would be reached between TRS and FedEx-Kinko's.

On September 21, 2006, TRS and DIT signed a second Mutual Nondisclosure/Non-Compete Agreement ("September Agreement"). The September Agreement was prepared by DIT, emailed to TRS in Georgia, signed by TRS in Georgia, and then returned to DIT's California office by email. This agreement contained the same Georgia choice of law provision as the August Agreement. Unlike the August Agreement, the September Agreement was to last the later of five years from the date of the Agreement or three years from the date on which confidential information was last disclosed. (September Agreement, ¶ 7). The parties disagree as to what the September Agreement applies. TRS contends that the relationship "contemplated by the [September Agreement] involved a potential partnership for the scanning of 30,000,000 images to be done on site for a healthcare facility in Northern California." (Complaint, ¶ 15). DIT contends that the September Agreement was meant to modify and replace the August Agreement, and the modifications were made to give DIT more protection than the August Agreement did. (Brownell, 2nd Decl., ¶ 9-10).

3

Either way, like the FedEx-Kinko's deal, the imaging contract for the healthcare facility never came to fruition.

In June of 2007, Amgen reached out directly to TRS concerning the original project, after which TRS again contacted DIT to see if DIT might be interested in being a subcontractor for the Amgen deal. Once more, a final agreement between Amgen and TRS never occurred. TRS contends that DIT subsequently contracted with FedEx-Kinko's on the Amgen project without involvement by TRS, and it is out of this alleged activity that TRS's claims arise. (Complaint, ¶ 20-21).

TRS filed suit in this court on October 20, 2008 alleging breach of the August Agreement and tortious interference with a business relationship. (Complaint, ¶ 28). TRS also seeks a declaration of its rights and remedies under both the August and September Agreements. *Id*. DIT filed the current motion to dismiss TRS's claims under Fed. R. Civ. P. 12(b)(2) and 12(b)(3), alleging that this court has no personal jurisdiction over DIT and that the Northern District of Georgia is an improper venue for the action.

In support of its motion to dismiss, Defendant submitted the declaration of Robert Brownell, one of two shareholders, directors, and officers of DIT. Brownell testified that DIT has never transacted business in Georgia, that any face-to-face negotiations of the August Agreement occurred in California, and that the subject matter of the relationship sought to be pursued under the August Agreement was located in California. Brownell

4

further asserted that "[a]ll possible business opportunities TRS sought to pursue with DIT have been located in California," and "[n]o opportunities DIT and TRS discussed involved work to be performed in Georgia." Brownell also testified to the following:

- DIT has never performed or sought to work in Georgia.
- DIT has never had customer, third-party, or other ongoing relationships in Georgia.
- DIT has never had property in Georgia.
- DIT has never had offices in Georgia.
- DIT has never had employees in Georgia.
- DIT has never had agents in Georgia.
- DIT has never been licensed or authorized to do business in Georgia.
- DIT has never purchased or sold goods in Georgia.
- DIT has never visited TRS in Georgia.
- DIT and TRS have never had a long term or continuous relationship.
- All actions involving the companies referenced in TRS's October 20, 2008 Complaint filed in this Court occurred in California.

(Brownell Declaration, ¶ 22-32).

According to Plaintiff, there was contact between the parties regarding possible business opportunities other than the healthcare facility imaging project and the FedEx-Kinko's deal. Based on the affidavit of a TRS officer, Jack Elder, Plaintiff's Response states the following:

> Over the course of a fourteen-month period between the late summer of 2006 and September 2007, TRS and DIT worked together to identify approximately twelve business opportunities where a strategic partnership between the companies might be utilized to obtain business. Of these twelve opportunities, nine of them were initiated by DIT contacting TRS in the State of Georgia with the opportunity. In all nine instances, DIT asked TRS to drive the operational aspects of the projects.

5

(Plaintiff's Response, 7) (internal citations omitted). While none of these opportunities turned into actual agreements, Plaintiff states that they would have "involved TRS developing the solution, recruiting the vendors to provide the solution, and developing the pricing. DIT turned control of the production process and pricing over to TRS." *Id*.

**B.     Contentions**

Plaintiff responded to Defendant's motion to dismiss, asserting that jurisdiction and venue are both proper. First, as to the August Agreement, Plaintiff contends that jurisdiction is proper because the Agreement requires Plaintiff (1) to refrain from disclosing certain information from and in Georgia and (2) to take action from Georgia such as "designating confidential information, notifying DIT in writing of unauthorized disclosure of confidential information, and returning documents at the termination of the Agreement or upon request." (Plaintiff's Response Brief, 4). Further, Plaintiff argues that the choice of law provision in the August Agreement, which designates that Georgia law governs, allows jurisdiction over the Defendant. Finally, Plaintiff contends that a large portion of the negotiations between the parties took place by either telephone or email between Plaintiff's Georgia office and DIT's California office. Plaintiff's arguments regarding the September Agreement are essentially the same. Plaintiff also contends that Defendant took other actions that would confer personal jurisdiction, beyond just those surrounding the August and September

6

Agreements. Those contacts involve the nine times TRS was approached by DIT regarding possible agreements between the two outside of the FedEx-Kinko's project.

Plaintiff argues that the court can assert specific personal jurisdiction over DIT based upon the August and September Agreements because DIT has purposefully established minimum contacts with Georgia, and exercising personal jurisdiction over DIT would not be unfair. TRS further contends that general personal jurisdiction over the Defendant is also appropriate due to DIT's continuous and systematic contacts with Georgia. Plaintiff also claims that venue in the Northern District of Georgia is proper because the court has personal jurisdiction over Defendant.

Defendant, however, maintains that the court has neither specific nor general jurisdiction. Defendant does not currently and has never had any offices, agents, employees, or property in Georgia. Defendant has never done business in Georgia. Defendant has also never had a customer in Georgia or purchased goods or services from Georgia. Defendant argues its sole tie to Georgia is the fact that TRS has an office there. It has no other links to Georgia outside of this former relationship with TRS. Additionally, according to DIT, TRS's argument basically states that jurisdiction over Defendant exists solely based on TRS's contacts with Georgia rather than any actions taken by Defendant. Defendant argues this is not a proper basis for personal jurisdiction, and because this court has no jurisdiction, venue is also improper.

7

## II. Discussion

### A. Personal Jurisdiction

In a case such as this, where no evidentiary hearing is held, the plaintiff bears the burden of establishing "a prima facie case of personal jurisdiction over [the] nonresident defendant." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). The plaintiff must present enough evidence to support a motion for directed verdict. *Id*. The court must accept as true the facts alleged by the plaintiff in its complaint, where such facts are not contradicted by the defendant's affidavits. *Id*. Where the plaintiff's complaint and affidavits and the defendant's affidavits conflict, all reasonable inferences must be construed in favor of the plaintiff. *Id*.

Both statutory and constitutional authority is necessary for a court to exercise jurisdiction over a nonresident defendant. *McGee v. Int'l Life Insur. Co.,* 355 U.S. 220 (1957). First, the court must determine whether Defendant's alleged acts come within Georgia's Long Arm statute. *Madara*, 916 F.2d at 1515. If so, the court still must assess whether jurisdiction is appropriate under the Due Process Clause of the Fourteenth Amendment. *Id*. Georgia's Long Arm statute provides jurisdiction over a nonresident defendant in several instances relevant to this case as there is both a contract claim and a claim sounding in tort. There is jurisdiction over a nonresident defendant where he "[t]ransacts any business" in the state of Georgia or where he "[c]ommits a tortious injury

8

in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." O.C.G.A. § 9-10-91(1),(3).

The Georgia Supreme Court recently held that § 9-10-91(1) "grants Georgia courts the unlimited authority to exercise personal jurisdiction over a nonresident who transacts any business in this State." *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 279 Ga. 672, 675 (2005) (construing the statute to confer jurisdiction to maximum degree allowed by procedural due process). However, the Georgia Supreme Court stated that § 9-10-91(3) must read literally, in accordance with the exact language of the statute. Plaintiff's claim for tortious interference with a business relationship does not provide jurisdiction over Defendant under § 9-10-91(3). Defendant has never performed work in Georgia, had a customer in Georgia, had property, offices, employees, or agents in Georgia, or purchased or sold goods in Georgia. Other than Defendant's recent relationship with Plaintiff, it has no other contacts with Georgia. Additionally, neither party contends that Defendant received any revenue from Plaintiff. Therefore, under the plain language of Georgia's Long Arm statute, Defendant has not regularly engaged in any persistent course of conduct in the state, nor has it derived any revenue from goods used or consumed here or services provided in this state. As § 9-10-91(3) does not apply to Defendant, the court

9

considers only § 9-10-91(1), which is coterminous with constitutional due process. *Innovative Clinical*, 279 Ga. at 675.

Determining whether personal jurisdiction over a nonresident defendant accords with due process requires consideration of two factors. *Madara v. Hall*, 916 F.2d 1510, 1515-16 (11th Cir. 1990). The first is whether the defendant has established "minimum contacts" with Georgia. *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1996). If such minimum contacts exist, the court decides whether the exercise of personal jurisdiction over the defendant "would offend 'traditional notions of fair play and substantial justice.'" *Id*. (citing *Intern'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)).

The "nature and quality" of the minimum contacts needed differs depending on whether the plaintiff is asserting specific or general personal jurisdiction. *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). Specific jurisdiction addresses situations where the defendant's contacts with the state are associated with the cause of action. *Helicopteros Nacionales de Colombia*, *N.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). General jurisdiction, on the other hand, can be exercised even where the nonresident's contacts with the forum state are unrelated to the underlying claim, as long as those contacts are of a sufficient quality. *Id*. at 414 n.9. Here, Plaintiff argues that the court has both specific and personal jurisdiction over Defendant.

10

### 1. Specific Jurisdiction

To assert specific jurisdiction over a nonresident defendant, the plaintiff must show the defendant has established such minimum contacts with the forum state that the exercise of personal jurisdiction over the defendant would not offend "traditional notions of fair play and substantial justice." *Borg-Warner Acceptance Corp.*, 786 F.2d at 1057.

#### a. Minimum Contacts

The minimum contacts analysis demands plaintiff demonstrate that the defendant's contacts with Georgia are (1) related to the cause of action stated in the plaintiff's complaint; (2) the defendant has purposefully availed itself of the privileges of the forum; and (3) the defendant's contacts were of such a nature it should have "reasonably anticipat[ed] being haled into court there." *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627 (11th Cir. 1994) (internal quotations omitted). As the contacts with Georgia must be related to the underlying action, the only contacts relevant to this part of the court's analysis are those involving the August and September Agreements, and any contacts concerning the potential FedEx-Kinko's/Amgen relationship.

The first factor of the minimum contacts inquiry is "easily satisfied" where the dispute arises from a contract between the nonresident and resident. *Paul, Hastings, Janofsky, and Walker, LLP v. City of Tulsa, Oklahoma*, 245 F. Supp. 2d 1248, 1256 (N.D. Ga. 2002) (Martin, J.); *See also Allegiant Physicians Servs., Inc. v. Sturdy Mem'l Hosp.*, 926

11

F. Supp. 1106, 1114 (N.D. Ga. 1996) (Hull, J.). Plaintiff's complaint alleges a breach of the August Agreement and tortious interference with the FedEx-Kinko's business relationship, which prompted the August Agreement. Plaintiff also requests declaratory relief regarding both the August and September Agreements entered into with Defendant. Defendant's contacts with Plaintiff, a resident of Georgia, are the basis of the complaint, and therefore related. The court finds that the first element of the minimum contacts test is fulfilled.

The second and third parts of the minimum contacts test are more difficult. The purposeful availment requirement is meant to prevent the defendant from being haled into court unforeseeably when jurisdiction is solely premised on "random, fortuitous, or attenuated contact, or of the unilateral activity of a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotations and citations omitted). The question, therefore, is whether the defendant has "deliberately . . . engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum." *Id*. Where such deliberate behavior exists, jurisdiction is appropriate because "his activities are shielded by the benefits and protections of the forum's laws" such that "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id*. The existence of a contract between the resident and nonresident alone is not enough to confer jurisdiction. *Burger King,* 471 U.S. at 478-79.

12

"In analyzing minimum contacts in the context of a business relationship between two parties, great weight is often placed on which party initiated the contact that led to the business relationship." *Railcar, Ltd. v. Southern Illinois Railcar Co.*, 42 F. Supp. 2d 1369, 1374 (N.D. Ga. 1999) (Camp, J.). *See also Francosteel Corp.*, 19 F.3d at 628 ("[W]ith respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other [s]tate for the consequences of their activities.") (internal quotations omitted). Plaintiff initiated a relationship with Defendant by contacting DIT about the FedEx-Kinko's project, and this was the first time the parties were ever in contact with one another. That Plaintiff initiated contact with Defendant does not weigh in favor of exercising personal jurisdiction. However, this is not conclusive, and other relevant factors must be considered.

The fact that Defendant never appeared physically in Georgia is also relevant, but does not by itself destroy jurisdiction. *Burger King*, 471 U.S. at 476. Here, any contact with Georgia occurred through telephone calls, emails, or other alternative means of electronic communication. Prior to the Georgia Supreme Court's decision in *Innovative Clinical*, Georgia courts consistently held that contact by mail or telephone was not enough to allow jurisdiction. *Allegiant Physicians Servs., Inc.*, 926 F. Supp. at 1116 (holding that regular phone communications with plaintiff's Georgia offices did not constitute purposeful

13

availment); *ETS Payphone v. TK Indus.*, 236 Ga. App. 713, 715 (1999) ("It is well settled that an out-of-state defendant will not be deemed to have engaged in purposeful business activity in this state on the basis of telephone or mail contact."); *Pleats, Inc. v. OMSA, Inc.*, 211 Ga. App. 643, 646 (1993) ( "Mere telephone or mail contact with an out-of-state defendant is insufficient to establish the purposeful activity with Georgia required by the Long Arm statute."); *Mayacamas Corp. v. Gulfstream Aerospace Corp.*, 190 Ga. App. 892, 893 (1989) ("[M]ere telephone or mail contact with an out-of-state defendant, or even the defendant's visits to this state, is insufficient to establish the purposeful activity with Georgia required by the Long Arm statute.") (internal quotations and citations omitted). However, recent Georgia case law indicates otherwise. After holding that § 9-10-91(1) was coextensive with constitutional due process in *Innovative Clinical*, the Georgia Supreme Court remanded the case to the lower court stating that "because it was bound by prior precedent, the Court of Appeals did not fully consider whether the trial court had personal jurisdiction over the [nonresident] under [§ 9-10-91(1)], limiting its review to . . . the lack of physical contacts (i.e., the presence of only postal and telephonic contacts)." 279 Ga. at 675. The Georgia Supreme Court did not say that these contacts would be enough. It merely requested that the Court of Appeals determine whether they were sufficient under the court's holding regarding § 9-10-91(1). *Id.*

14

On remand, the Georgia Court of Appeals held that there was personal jurisdiction based on those intangible contacts. *First Nat'l Bank of Ames, Iowa v. Innovative Clinical & Consulting Servs., LLC*, 280 Ga. App. 337, 338 (2006), *cert. denied*, 549 U.S. 1321 (2007). The defendant in the case, a bank, was based in Iowa. *First Nat'l Bank of Ames, Iowa v. Innovative Clinical & Consulting Servs., LLC*, 266 Ga. App. 842, 842 (2004), *aff'd in part, denied in part*, 279 Ga. 672 (2005). The plaintiff, a Georgia resident, leased goods from a nonparty to the litigation. *Id*. at 843. The bank had a security interest in those goods. *Id*. at 842. When that nonparty failed to pay a debt it owed to the bank, the bank tried to collect the money from the plaintiff. *Id*. at 843. After unsuccessfully attempting to resolve the problem through mail and telephone contact with the defendant, the plaintiff sued. *Id*.

The nonresident bank had no physical connections with Georgia; however, it did have telephonic and mail contacts with the plaintiff, a Georgia resident. *First Nat'l Bank of Ames, Iowa v. Innovative Clinical & Consulting Servs., LLC*, 280 Ga. App. at 338. The court found those sufficient to confer jurisdiction. *Id*. "Even if the bank did not 'regularly' conduct business or engage in a 'persistent course of conduct' in Georgia, [under § 9-10-91(3)], no doubt exists that the bank sought to derive economic benefit from its interstate business activity involving [the Georgia resident]. To that end, its postal, telephone, and other intangible Georgia contacts suffice to bring it within the purview of [§ 9-10-91(1)]." *Id*. Therefore, intangible contacts can amount to transacting business in the state of Georgia.

15

The court then made a separate and very brief constitutional analysis, holding that the bank had such minimum contacts with Georgia that exercising jurisdiction over it would not offend notions of fair play and substantial justice. *Id*. In conclusion, the court stated that "[b]ecause the bank transacted some business in Georgia, even if only with this one customer, and because that business was sufficient to meet the constitutional standard for minimum contacts with this state," jurisdiction was proper. *Id*.

In light of that decision, it is now possible under Georgia law that intangible contacts with the forum state can lead to jurisdiction. Here, Defendant and Plaintiff were seeking to profit from the relationship with one another, and that relationship was garnered through and furthered by telephone and email contacts between the parties. Because Defendant "sought to derive economic benefit" from its relationship with Plaintiff, Defendant did transact business in Georgia through its telephone and email contacts under *Innovative Clinical*. 280 Ga. App. at 338. Recognizing the shift in Georgia law, the court finds that Defendant did transact business in Georgia.

Defendant has also created obligations between itself and Plaintiff. While the current dispute between the parties has probably made any future arrangements between the companies unlikely, the parties' intentions at the time of the contract formation are still relevant. *See Burger King*, 471 U.S. at 479-80 (describing anticipated long-term nature of the relationship between franchisor and franchisee as a factor weight in favor of exercising

16

personal jurisdiction). In *Burger King*, the parties entered into a contract that was intended to last for twenty years. 471 U.S. at 480. While not a twenty-year commitment, in signing the August Agreement with Plaintiff, DIT agreed to a contract term of three years, minimum. Under the September Agreement, which DIT initiated, the term was to last at least five years, maybe longer. Additionally, while neither party offers facts indicating how long the potential FedEx-Kinko's relationship would have lasted—had Plaintiff and Defendant successfully obtained that contract as they intended, DIT would have committed itself to a continuing relationship with Plaintiff. Because DIT intentionally entered into at least one agreement with a Georgia resident, with the intent of creating a continuing relationship with that resident, this counsels for a finding of personal jurisdiction.

Another factor favoring jurisdiction is that both the August and September Agreements contain a Georgia choice of law clause. A choice of law clause is relevant to the personal jurisdiction analysis, although not conclusive alone. *Burger King*, 471 U.S. at 482. Here, not only did Defendant sign the August Agreement containing the Georgia choice of law clause, but it requested and drafted the September Agreement, which also contained a Georgia choice of law clause. Combined with its attempts to create a continuing relationship with Plaintiff regarding the FedEx-Kinko's/Amgen project, the choice of law clauses in the Agreements further tilt the balance in favor of personal jurisdiction. Because Defendant purposefully availed itself of this state by attempting to establish a continuing

17

relationship with a Georgia resident, and signing two agreements that are governed by Georgia law, the court holds that there is personal jurisdiction over Defendant. Defendant could have reasonably expected to be haled into court here based on those contacts, and Defendant's contacts are certainly not the "result of random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475 (internal quotations omitted).

### b. Fair Play and Substantial Justice

After determining whether a defendant has the requisite minimum contacts with the forum state, the court must look to certain factors and decide if exercising jurisdiction would offend the traditional notions of fair play and substantial justice. *Madara*, 916 F.2d at 1517. Those factors include:

> [T]he burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental substantive social policies.

*Id*. (citing *Burger King*, 471 U.S. at 477; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

Defendant contends that the forum is inconvenient because its employees and officers that were involved in the TRS transactions are all in California, and therefore, all relevant evidence and witnesses are in California. Defendant contends that this makes it "fundamentally unfair" to require DIT to litigate in Georgia. The court disagrees. The

inconvenience to Defendant must rise to the level of being "so substantial as to achieve constitutional magnitude." *Burger King*, 471 U.S. at 484. That is not the case here. Although DIT has not physically appeared in Georgia, "modern improvements in transportation and communication significantly lessen [the] hardship" on nonresidents of traveling to the forum state. *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 393 (11th Cir. 1988). Also, Georgia certainly has an interest in providing a forum for its residents that have been injured by a nonresident. *See Paul, Hastings, Janofsky, and Walker*, *LLP*, 245 F. Supp. 2d at 1259 (citing *Burger King*, 471 U.S. at 473). *See also Madara*, 916 F.2d at 1510. Furthermore, Plaintiff has a great interest in litigating in the state where it resides. *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996). Finally, relevant witnesses and evidence undoubtedly exist in Georgia, as well as California. The inconvenience to Defendant does not outweigh these considerations.

### 2. General Jurisdiction

Because the court holds there is specific jurisdiction, it need not address Plaintiff's claim that Defendant is also subject to general jurisdiction in this state.

### B. Venue

Defendant requests that the case be dismissed or transferred to a California court under 28 U.S.C. § 1406(a) because venue is improper due to lack of jurisdiction. Title 28 U.S.C. § 1391(a)(1) allows venue in the judicial district where the defendant resides. Under

19

§ 1391(c), a corporation resides in the judicial district in which it is subject to personal jurisdiction when the action is commenced. Where there is more than one judicial district in a state, the corporation resides in "any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(c). As the court finds that it does in fact have personal jurisdiction, the court will not dismiss or transfer the case under § 1406 because Defendant neglects to provide any other basis for its argument that venue is improper. Furthermore, Defendant has not addressed § 1391(a)(2), which finds venue proper in a district where "a substantial part of the events or omissions giving rise to the claim occurred." Defendant neglects to provide this court with the information necessary to determine whether venue should be dismissed or transferred under § 1406.

### III. Conclusion

The court DENIES Defendant's Motion to Dismiss [3]. Defendant is directed to answer Plaintiff's complaint within the time set forth in the Federal Rules of Civil Procedure and this court's local rules.

**IT IS SO ORDERED** this 25th day of August 2009.

/s J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)